**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard TAPERT, Harvey Golden, Gerald Weingarden, Donald Freedlander and Robert Gash, Defendants-Appellants.**

**Nos. 79–5222–79–5224, 79–5269 and 79–5270.**

United States Court of Appeals, Sixth Circuit.

Argued April 17, 1980.

Decided June 16, 1980.

Rehearing and Rehearing En Banc Denied Aug. 19, 1980.

Nathaniel R. Jones, Circuit Judge, filed separate concurring opinion.

Michael H. Golob, Detroit, Mich., for defendant-appellant in No. 79–5222.

Robert S. Harrison, Warren J. Perlove, Southfield, Mich., for defendant-appellant in No. 79–5223.

Albert J. Krieger, Miami, Fla., for defendant-appellant in No. 79–5224.

Neil H. Fink, Cynthia Goldfarb, Detroit, Mich., for defendant-appellant in No. 79–5269.

Terence Page, Birmingham, Mich., for defendant-appellant in No. 79–5270.

James K. Robinson, U. S. Atty., Francis L. Zebot, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before WEICK and JONES, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

HARRY PHILLIPS, Senior Circuit Judge.

These are consolidated appeals by five Detroit osteopathic physicians who were convicted of receiving kickbacks for sending urine and blood samples of their patients to Titan Laboratories (Titan) for analysis. All five of the physicians were enrolled in the Medicare and Medicaid programs and the charges for the laboratory analysis were paid to Titan out of Medicare and Medicaid funds. The district court held that the pay-

ments violated the original version of 42 U.S.C. § 1396h(b),[1] which was in effect during the years involved in this case. In 1977 Congress amended the statute so as to remove any possible doubt that conduct such as that involved in the present case violates the Act.[2]

The principal issues on this appeal are whether the information under which appellants were convicted charges a violation of the pre-1977 version of 42 U.S.C. § 1396h(b)(1) (note one), and whether the statute is unconstitutional for vagueness. Then Chief District Judge Cornelia Kennedy, now a judge of this court, ruled that the payments to the doctors were kickbacks, that the information charges a violation of the statute and that the statute is not invalid for vagueness. We affirm.

I

Apparently Titan initiated the arrangement for the kickbacks, by having its repre-

---

1. (b) Whoever furnishes items or services to an individual for which payment is or may be made in whole or in part out of Federal funds under a State plan approved under this [subchapter] [42 USCS §§ 1396–1396d, 1396f–1396i] and who solicits, offers, or receives any—
(1) kickback or bribe in connection with the furnishing of such items or services or the making or receipt of such payment, or
(2) rebate of any fee or charge for referring any such individual to another person for the furnishing of such items or services
shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

2. The amended § 1396h(b)(1) is as follows:
(b)(1) Whoever solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under this subchapter, or
(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under this subchapter,
shall be guilty of a felony and upon conviction thereof, shall be fined not more than

$25,000 or imprisoned for not more than five years, or both.
(2) Whoever offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under this subchapter, or
(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under this subchapter,
shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
(3) Paragraphs (1) and (2) shall not apply to—
(A) a discount or other reduction in price obtained by a provider of services or other entity under this subchapter if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under this subchapter; and
(B) any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services.

sentative contact one of the physicians.[3] In return for payments from Titan or one of its affiliates, the physician agreed to send his patients' specimens to Titan and to encourage his colleagues to do the same. Other physicians entered into similar agreements, which Titan described as "consulting" arrangements. This pattern of activity began in April 1974 and continued until January 1978.

Beginning in 1976, the physicians began depositing their Titan checks in an escrow fund for the purpose of acquiring an interest in Titan. The fund was administered by J.K.F. Inc., a corporation set up by the physicians to hold the Titan stock they proposed to buy. When the escrow fund reached $60,000, the physicians contributed an additional $15,000 and J.K.F. Inc. acquired a 40 per cent interest in Titan.

On September 21, 1978, a federal grand jury returned a 37 count indictment against appellants, five other individuals and three Michigan corporations. On February 2, 1979, the Government filed a 42 count follow-up information charging appellants with soliciting and receiving Medicare and Medicaid kickbacks from Titan and associated entities. The information thereafter was amended. The version under which appellants were convicted is referred to in the record as the Amended Follow-Up Information.

Judge Kennedy denied the motions of appellants to dismiss the indictments. Thereafter, in a published opinion, she denied their motions for a rehearing. *United States v. Weingarden*, 468 F.Supp. 410 (E.D. Mich.1979). In this opinion Judge Kennedy held that the pre-1977 version 42 U.S.C. § 1396h(b)(1) prohibited the conduct charged in the information, and that the challenged statute was sufficiently clear to give to appellants adequate notice that their alleged conduct was illegal.

Thereafter, under a plea bargaining agreement, each of the appellants entered a

plea of guilty to certain counts of the information applicable to him. The Government approved dismissal of the indictment.

## II

■ Prior to their guilty pleas, the appellants gave notice that they intended to appeal the ruling of the district court on the applicability of § 1396h(b)(1). To preserve the issue for appeal, they moved for arrest of judgment under Fed.R.Crim.P. 34 on the ground that the statute did not apply to their conduct and the district court, therefore, had no jurisdiction to accept their guilty pleas. This is the procedure approved by this court in *United States v. Heller*, 579 F.2d 990, 992–93, and n. 1 (6th Cir. 1978). *See also North Carolina v. Alford*, 400 U.S. 25, 37–38, 91 S.Ct. 160, 167, 27 L.Ed.2d 162 (1970); *United States v. Cox*, 464 F.2d 927, 941 (6th Cir. 1972). The Government concedes that the alleged defects raised by appellants are jurisdictional and not waived by their guilty pleas. Consequently the legal issue is properly before this court.

## III

Dr. Gerald Weingarden entered a plea of guilty to Counts three through seven of the Amended Follow-Up Information, which are as follows:

On or about the dates listed below, in the Eastern District of Michigan, Gerald Weingarden, D.O., having obtained services from Titan Laboratories, Inc., for which payment was to be made in part out of federal funds under a state plan approved under Title XIX of the Social Security Act, did knowingly and wilfully solicit and receive kickback payments from Titan Laboratories, Inc., Spartan Laboratories, Inc., and M. A. Delaney, Inc., as detailed below in connection with the furnishing of the aforesaid services, each payment being a separate count of this indictment.

---

**3.** *See United States v. Shermetaro*, 625 F.2d 104 (No. 78–5148, 6th Cir. 1980), in which this court affirmed the conviction of one of the parties to this scheme under 18 U.S.C. § 371 for

conspiracy to defraud the United States by obstructing the collection of income taxes from Titan Laboratories.

To wit, the Government contends Gerald Weingarden, received monetary payments labelled "consulting fees" from an entity related to Titan Laboratories, Inc., namely Spartan Laboratories, Inc., principally to induce the defendant to send his laboratory work to Titan. In addition, it was agreed that the defendant would perform the following services: (1) to form and assist in the formation of J.K.F., Inc., as described in Indictment Number 78–80689, and (2) to encourage other doctors to send their laboratory work to Titan, as described in Indictment Number 78–80689.

Gerald Weingarden visited Titan Laboratories, Inc., from time to time, in connection with the performance of the above-described services.

The claims filed by Titan Laboratories, Inc., were in accordance with the Medicaid statutes and regulations, and the monies received by Titan Laboratories, Inc., were those to which Titan Laboratories, Inc., was entitled. That is, when Titan Laboratories, Inc., was asking for payment for specific blood work, that blood work had been done, and that the billing for that blood work was in accordance with Medicaid statutes and regulations.

| Count | Approximate Date of Payment | Amount of Money | Source of Payment |
| --- | --- | --- | --- |
| 3 | October 27, 1976 | $1,000 | Spartan Laboratories, Inc. |
| 4 | November 22, 1976 | $1,000 | Spartan Laboratories, Inc. |
| 5 | December 28, 1976 | $1,000 | Spartan Laboratories, Inc. |
| 6 | March 1, 1977 | $1,000 | Spartan Laboratories, Inc. |
| 7 | March 1, 1977 | $1,000 | Spartan Laboratories, Inc. |

All in violation of Title 42, U.S.C., Section 1396h(b)(1).

At his Rule 11 sentencing hearing, Dr. Weingarden admitted that he had committed the acts charged in the information.

Dr. Harvey Golden entered a plea of guilty to Counts 11 through 15 of the Information, which charged as follows:

On or about the dates listed below, in the Eastern District of Michigan, Harvey Golden, D.O., having obtained services from Titan Laboratories, Inc., for which payment was to be made in part out of federal funds under a state plan approved under Title XIX of the Social Security Act, did knowingly and wilfully solicit and receive kickback payments from Titan Laboratories, Inc., and Media Technology, Inc., as detailed below in connection with the furnishing of the aforesaid services, each payment being a separate count of this indictment.

To wit, Harvey O. Golden, D.O., received monetary payments from Titan Laboratories, Inc., in exchange for referring his laboratory work to Titan Laboratories, Inc. The claims filed by Titan Laboratories, Inc., were in accordance with the Medicaid statutes and regulations, and the monies received by Titan Laboratories, Inc., were those to which Titan Laboratories, Inc., were entitled. That is, when Titan Laboratories, Inc., was asking for payment for specific blood work, that blood work had been done, and that the billing for that blood work was in accordance with Medicaid statutes and regulations.

| Count | Approximate Date of Payment | Amount of Money | Source of Payment |
| --- | --- | --- | --- |
| 11 | May 27, 1974 | $850 | Titan Laboratories, Inc. |
| 12 | August 8, 1974 | $900 | Media Technology, Inc. |
| 13 | September 3, 1974 | $1,500 | Titan Laboratories, Inc. |
| 14 | October 24, 1974 | $1,000 | Titan Laboratories, Inc. |
| 15 | December 6, 1974 | $1,500 | Titan Laboratories, Inc. |

All in violation of Title 42, U.S.C., Section 1396h(b)(1).

At his Rule 11 sentencing hearing, Dr. Golden testified as follows:

THE COURT: Knowing those things, how do you wish to plead at this time to Counts 11, 12, 13, 14, 15?

DEFENDANT GOLDEN: Guilty, your Honor.

THE COURT: Will you tell me in your own words what it is that you did do that causes you to plead guilty?

DEFENDANT GOLDEN: Part of my motives I stated, perhaps an equal amount of my motives were for the inducement of monetary gain.

THE COURT: In other words, to receive payment from Titan for sending work to Titan?

DEFENDANT GOLDEN: Yes.

THE COURT: And some of that work at least was Medicare and Medicaid work?

DEFENDANT GOLDEN: Yes, your Honor.

THE COURT: Would that be true for all of the periods involved here, May 27, 1974, through December 6, 1974?

DEFENDANT GOLDEN: Yes, your Honor.

Dr. Donald Freedlander entered a plea of guilty to Counts 17 through 21 of the Information, which charged as follows:

On or about the dates listed below, in the Eastern District of Michigan, Donald Freedlander, D.O., having obtained services from Titan Laboratories, Inc., for which payment was to be made in part out of federal funds under a state plan approved under Title XIX of the Social Security Act, did knowingly and wilfully solicit and receive kickback payments from Titan Laboratories, Inc., and M. A. Delaney, Inc., as detailed below in connection with the furnishing of the aforesaid services, each payment being a separate count of this indictment.

To wit, the Government contends Donald Freedlander, D.O., received monetary payments from an entity related to Titan Laboratories, Inc., namely M. A. Delaney, Inc., principally to induce Donald Freedlander, D.O., to send his laboratory work to Titan Laboratories, Inc. In addition, it was agreed that Donald Freedlander would perform the following services:

(1) to form and assist in the formation of J.K.F., Inc., as described in Indictment Number 78–80689, and (2) to encourage other doctors to send their laboratory work to Titan Laboratories, Inc., as described in Indictment Number 78–80689.

The claims filed by Titan Laboratories, Inc., were in accordance with the Medicaid statutes and regulations, and the monies received by Titan Laboratories, Inc., were those to which Titan Laboratories, Inc., were entitled.

That is, when Titan Laboratories, Inc., was asking for payment for specific blood work, that blood work had been done, and that the billing for that blood work was in accordance with Medicaid statutes and regulations.

| Count | Approximate Date of Payment | Amount of Money | Source of Payment |
|---|---|---|---|
| 17 | August 23, 1976 | $200 | M. A. Delaney, Inc. |
| 18 | August 23, 1976 | $200 | M. A. Delaney, Inc. |
| 19 | September 7, 1976 | $200 | M. A. Delaney, Inc. |
| 20 | September 10, 1976 | $200 | M. A. Delaney, Inc. |
| 21 | September 15, 1976 | $200 | M. A. Delaney, Inc. |

All in violation of Title 42, U.S.C., Section 1396h(b)(1).

At his Rule 11 sentencing hearing, Dr. Freedlander testified as follows:

THE COURT: Will you tell me what it was that you did on or about the dates mentioned that causes you to plead guilty? What did you do on or about August 23rd, 1976, with regard to these checks apparently from M. A. Delaney, Inc.?

DEFENDANT FREEDLANDER: These checks were received by me, yes, your Honor, they were received by me.

THE COURT: You received the checks described in Counts 17, 18, 19, 20, 21?

DEFENDANT FREEDLANDER: Yes, I did, your Honor.

THE COURT: From M. A. Delaney?

DEFENDANT FREEDLANDER: Yes, I did.

THE COURT: And did you have some relationship at least with Titan Laboratories as stated in the information?

DEFENDANT FREEDLANDER: Yes, I did, your Honor.

THE COURT: And did that include some kind of business involving Medicare and Medicaid?

DEFENDANT FREEDLANDER: Right.

THE COURT: In other words, this was business with Titan Laboratories that included some business relating to Medicare and Medicaid samples?

DEFENDANT FREEDLANDER: Yes, your Honor.

THE COURT: Did you receive these payments for sending work to Titan Laboratories?

DEFENDANT FREEDLANDER: Yes, I did, your Honor.

THE COURT: Did you perform any services for these companies, M. A. Delaney and Titan Lab?

DEFENDANT FREEDLANDER: Yes, I did, your Honor, I helped with the formation and was of assistance to the J.K.F. Corporation.

\* \* \* \* \* \*

THE COURT: You have said something about, among other things, and that was kind of confusing to me, except for setting up J.K.F. Corporation, did you provide any other services to Titan Laboratories?

DEFENDANT FREEDLANDER: Yes, among other things, I encouraged other physicians to send their work to the laboratory.

THE COURT: In other words, there may not be a factual basis for this plea other than the statement that you in fact performed services besides sending business to Titan Lab?

MR. FINK: I think under the general intent statute, I don't think there has to be a dominant purpose, your Honor. He has indicated that that was one of the things he received consideration for.

THE COURT: As long as it is clear, and I am not so sure it is clear from the statement, was one of the reasons that you received these payments from Titan Lab, or from M. A. Delaney, Inc., because you were sending your lab business to Titan Laboratories, was that one of the reasons?

DEFENDANT FREEDLANDER: In the total, yes, it was. It was part of it. It was one of the reasons.

\* \* \* \* \* \*

THE COURT: In view of the fact it uses the word wilfully and that there were other considerations, I think we should at least really know that he does wish to plead guilty. I have a little problem with the factual basis under his statement. Maybe I can ask him this question.

Was the referral of business to Titan Laboratories a substantial or significant reason?

DEFENDANT FREEDLANDER: They were among the reasons, you know, a combination as to the rest of it, why, I received the compensation, yes, your Honor.

THE COURT: I am still trying to find out if it was significant at all or was it just minor?

DEFENDANT FREEDLANDER: Well, when I say significant, your Honor, there are several components involved. Is this more strongly than this one or that one, as the case may be, as I say, I did give my blood work to the laboratory, I did help assist them, I did help in getting other doctors referred to them, and with the combination of everything I don't know where to put the weight on each one as to compensation, but all were done by me, that is true, and I did receive the compensation.

MR. FINK: Your Honor, the 1952 cases that you are familiar with, the Interstate travel in aid of racketeering cases, which are specific intent crimes, which I don't think this is, do not require the dominant purpose to be the travel, it can be a co-equal purpose.

THE COURT: Is he going to say it was co-equal with the other things?

DEFENDANT FREEDLANDER: With the other things, yes.

\* \* \* \* \* \*

THE COURT: As long as we get something that was co-equal with other services of recruiting doctors and helping to form this other corporation, the three of them would be co-equal?

DEFENDANT FREEDLANDER: Yes, your Honor.

THE COURT: I think that that is sufficient for that.

\* \* \* \* \* \*

THE COURT: I think I should ascertain that.

Did you, in fact, submit blood samples to Titan Laboratories?

DEFENDANT FREEDLANDER: That I did, your Honor.

THE COURT: And they were from Medicare and Medicaid patients?

DEFENDANT FREEDLANDER: Yes, they were.

MR. ROSEN: That's sufficient.

THE COURT: I think I asked that but maybe not so directly.

MR. ROSEN: I have nothing further.

THE COURT: And that was during the time period of these checks that were received from M. A. Delaney?

DEFENDANT FREEDLANDER: Yes, they were, your Honor.

THE COURT: And the payments from M. A. Delaney were for the three purposes: One because you sent your lab work to Titan; two, because they indicated tests; and, three, you were supplying other doctors to send their work to J.K.F. and/or others?

DEFENDANT FREEDLANDER: Yes, your Honor.

THE COURT: And you did what you did knowingly?

DEFENDANT FREEDLANDER: Yes, I did, your Honor.

THE COURT: Having discussed these matters this afternoon, do you still wish to plead guilty to Counts 17, 18, 19, 20 and 21?

DEFENDANT FREEDLANDER: Yes, I do.

Dr. Richard Tapert entered a plea of guilty to Counts 27 through 31 of the Information, which charged as follows:

On or about the dates listed below, in the Eastern District of Michigan, Richard Tapert, D.O., having obtained services from Titan Laboratories, Inc., for which payment was to be made in part out of

federal funds under a state plan approved under Title XIX of the Social Security Act, did knowingly and wilfully solicit and receive kickback payments from Titan Laboratories, Inc., and Associated Physicians Services Co., as detailed below in connection with the furnishing of the aforesaid services, each payment being a separate count of this indictment.

To wit, Richard Tapert, D. O., received monetary payments from an entity related to Titan Laboratories, Inc., namely Associated Physicians Services Company, in exchange for referring his laboratory work to Titan Laboratories, Inc. The claims filed by Titan Laboratories, Inc., were in accordance with the Medicaid statutes and regulations and the monies received by Titan Laboratories, Inc., were those to which Titan Laboratories, Inc., was entitled. That is, when Titan Laboratories, was asking for payment for specific blood work was in accordance with Medicaid statutes and regulations.

| Count | Approximate Date of Payment | Amount of Money | Source of Payment |
|---|---|---|---|
| 27 | June 24, 1975 | $200 | Associated Physicians Services, Co. |
| 28 | August 12, 1975 | $200 | Associated Physicians Services, Co. |
| 29 | September 9, 1975 | $500 | Associated Physicians Services, Co. |
| 30 | October 17, 1975 | $200 | Associated Physicians Services, Co. |
| 31 | December 10, 1975 | $200 | Associated Physicians Services, Co. |

All in violation of Title 42, U.S.C., Section 1396h(b)(1).

At his Rule 11 sentencing hearing, Dr. Tapert testified as follows:

THE COURT: How do you plead to counts 27 through 31?

THE DEFENDANT: I plead guilty.

THE COURT: Will you tell me what it was that you did do that causes you to plead guilty to those counts?

THE DEFENDANT: I accepted monetary payments from Associated Physicians Services Company in exchange for referring my laboratory work to Titan Laboratory.

THE COURT: And did you do that knowingly?

THE DEFENDANT: Yes, I did.

THE COURT: Are there any other questions the Government would like me to ask?

MR. ROSEN: Maybe your Honor could inquire as to the taking of blood samples from Medicare-Medicaid patients.

THE COURT: Yes, during this period of time that these payments were made, was some of the work that you were referring to Titan Laboratory or Associated Physicians Medicare and Medicaid work?

THE DEFENDANT: Yes.

THE COURT: For Medicare and Medicaid patients?

THE DEFENDANT: That is correct.

THE COURT: And would that be true during the period of each of these payments?

THE DEFENDANT: Yes.

THE COURT: Any other questions, Mr. Rosen?

MR. ROSEN: No, your Honor.

THE COURT: Have you had plenty of time to discuss this matter with your attorney?

THE DEFENDANT: Yes, I have.

THE COURT: And he has explained to you what it is the Government has to prove to prove you guilty?

THE DEFENDANT: Yes.

THE COURT: And you understand also that this is a final disposition insofar as this Court is concerned, that this plea of guilty, if the Court accepts it, it will not set aside the plea of guilty should an appeal be unsuccessful on the legal issues, do you understand?

THE DEFENDANT: I understand.

THE COURT: Having discussed these matters this afternoon, do you still wish to plead guilty to these counts?

THE DEFENDANT: Yes, I do.

Dr. Robert Gash entered a plea of guilty to Count 36 of the Information, which charged as follows:

On or about the dates listed below, in the Eastern District of Michigan, Robert Gash, D.O., having obtained services from Titan Laboratories, Inc., for which payment was to be made in part out of federal funds under a state plan approved under Title XIX of the Social Security Act, did knowingly and wilfully solicit and receive kickback payments from Titan Laboratories, Inc., and Associated Physicians Services Co., as detailed below in connection with the furnishing of the aforesaid services, each payment being a separate count of this indictment.

To wit, Robert Gash, D.O., received monetary payments from an entity related to Titan Laboratories, Inc., namely Associated Physicians Services Company, in exchange for referring his laboratory work to Titan Laboratories, Inc. The claims filed by Titan were in accordance with the Medicaid statutes and regulations and the monies received by Titan Laboratories, Inc., was entitled. That is, when Titan Laboratories, Inc., was asking for payment for specific blood work was in accordance with Medicaid statutes and regulations.

| Count | Approximate Date of Payment | Amount of Money | Source of Payment |
|---|---|---|---|
| 36 | August 11, 1975 | $200 | Associated Physicians Services, Co. |

All in violation of Title 42, U.S.C., Section 1396h(b)(1).

In his Rule 11 sentencing hearing, Dr. Gash testified as follows:

THE COURT: Will you tell me what you did on or about August 11, 1975 that causes you to plead guilty?

DEFENDANT GASH: On or about August 11, 1975, I received a check for $200.00 from Associated Physicians Services, Inc., for submission of lab work to Titan Laboratories.

THE COURT: To Titan Laboratories?

DEFENDANT GASH: Yes.

THE COURT: And was some of that lab work at least lab work under both Medicare and Medicaid?

DEFENDANT GASH: I would have to assume so. I really don't know that, your Honor.

THE COURT: But ordinarily there would be some within the work that you would submit within a month?

DEFENDANT GASH: I would say so, yes.

THE COURT: Does the Government have some evidence that some of this was?

MR. ROSEN: Yes, it does, your Honor.

THE COURT: Are there any other questions you would like to ask?

MR. ROSEN: No, your Honor.

THE COURT: Having discussed this matter this afternoon, do you still wish to plead guilty to Count 36?

DEFENDANT GASH: Yes, your Honor.

IV

In asserting that the statute was not sufficiently broad prior to the 1977 amendment to make their activities a criminal offense, and that the statute under which they were convicted is invalid for vagueness, appellants rely strongly upon

the fact that Congress found it necessary to enact the 1977 amendment.

An amendment to an existing statute is not an acknowledgment by Congress that the original statute is invalid. It is a common and customary legislative procedure to enact amendments strengthening and clarifying existing laws.

The report of the House Committee on Ways and Means contains the following statement on the purpose of the 1977 amendment:

> The committee bill would modify the penalty provisions *in existing law* which relate to those persons providing services under medicare and medicaid.
>
> *Existing law* provides specific penalties under the medicare and medicaid programs for certain practices that long have been regarded by professional organizations as unethical, which are unlawful in some jurisdictions, and which contribute significantly to the cost of the programs. Such practices as the submission of false claims, or the soliciting, offering, or *acceptance of kickbacks or bribes, including rebates or [sic] a portion of fees or charges for patient referrals, are misdemeanors under present law*
>
> . . .
>
> Recent hearing and reports, however, indicate that such penalties have not proved adequate deterrents against illegal practices by some individuals who provide services under medicare and medicaid. In addition, these misdemeanor penalties appear inconsistent with existing Federal criminal code sanctions which make similar actions punishable as felonies. Also, it has been brought to the attention of the committee by the U.S. Attorney's offices which have utilized these Social Security Act sanctions in the prosecution of medicare and medicaid fraud cases that the existing language of these penalty statutes is unclear and needs clarification.
>
> The committee bill would strengthen the penalty provisions *in existing law* which relate to persons providing services under medicare and medicaid . . .

In addition, the bill would *clarify and restructure* those *provisions in existing law* which define the types of financial arrangements and conduct to be classified as *illegal* under medicare and medicaid. (Emphasis added.) H.R.Rep.No.95–393(II), 95th Cong., 1st Sess., *reprinted in* (1977) U.S.Code Cong. & Admin.News, pp. 3039, 3055.

We agree with the definition of "kickbacks" adopted and applied by the Seventh Circuit in *United States v. Hancock*, 604 F.2d 999 (7th Cir. 1978). We follow that decision in affirming the decision of the district court that appellants have entered pleas of guilty under an Information charging them with violations of a valid statute which made their conduct a criminal offense. The record demonstrates to our satisfaction that the payments which the appellants admitted receiving were "kickbacks" within the meaning of the statute.

We choose to follow the Seventh Circuit in *Hancock*, rather than *United States v. Porter*, 591 F.2d 1048 (5th Cir. 1979). The reasons for this conclusion are stated well by Judge Kennedy in her published opinion. 468 F.Supp. at 412–15.

Appellants contend that they did not "furnish" the services in connection with which they received payments, and that the Information does not charge an offense. These and all other contentions made by appellants have been considered and found to be without merit.

The convictions are affirmed.

NATHANIEL R. JONES, Circuit Judge, concurring.

I agree that the term "kickback" should be defined to include "a percentage payment . . . for granting assistance by one in a position to open up or control a source of income." *United States v. Hancock*, 604 F.2d 999, 1002 (7th Cir. 1978). The United States has an important interest in securing the honest administration of federally funded programs. *United States v. Thompson*, 366 F.2d 167 (6th Cir.), *cert. denied*, 385 U.S. 973, 87 S.Ct. 512, 17

L.Ed.2d 546 (1966). I write separately to discuss a substantial issue of first impression concerning the construction of 42 U.S.C. § 1396h(b)(1) (1972): Is a physician, who provides services to medicaid patients and who receives illegal kickbacks from laboratories for the referral of those patients, for which referrals federal funds do not reimburse the doctor or the laboratory, a person who "*furnishes* items or services to an individual *for which* payment is or may be made in whole or part out of Federal funds . . . *and* who . . . receives any (1) kickback . . . *in connection* with the furnishing of *such* items or services . . .?" I concur with the majority's affirmative answer.

The language of the amended informations and the guilty pleas, as thoroughly reported in the majority opinion, define the facts of the case.[1] The defendants were charged with and pleaded guilty to receiving payments in various forms from a laboratory for patient referrals. The informations allege that the defendants "obtained services" from a laboratory, for which services medicaid would pay in part, and that the defendants received kickbacks in connection with these services. Consequently, the relevant services for which federal funds were paid are the tests performed by the laboratory. The record also establishes that the defendants were reimbursed by medicaid for their treatment of the same patients referred to the laboratories.

The facts raise two questions of statutory interpretation: 1) did the physicians "furnish" the laboratory services; and 2) were the kickbacks paid "in connection with" the laboratory services rather than just the patient referrals? Defendants argue that they did not "furnish" the laboratory services, since the laboratory actually performed the tests. They point out that their

services were reimbursed separately from the laboratory tests. Second, they argue that the kickbacks were paid "in connection with" the patient referrals rather than any service for which medicaid funds were paid. They declare that the kickbacks did not affect their treatment of patients or the laboratory's performance of tests.

It is fair to say that physicians in Michigan in 1976–1977 furnished the laboratory services to their patients. The physicians took the specimens and sent them to a laboratory. A laboratory could act only on orders from the physicians. Mich.Comp. Laws Ann. §§ 325.81(b), 325.89(b), repealed by Mich.Comp.Laws Ann. § 333.20501 *et seq.* (1978); *cf.* 42 C.F.R. § 405.1316(e) (Medicare regulations). The laboratory could report the test results only to the physicians, unless they instructed otherwise. Mich.Adm.Code R. 325.2353(2) (Rule 53); *cf.* 42 C.F.R. § 405.1316(g) (Medicare regulations). The physicians bore the responsibility of interpreting the test data. In short, the physicians did everything but actually perform the clinical tests. Under these circumstances, by interpreting the word "furnish" according to its common usage to mean "supply or provide", I would hold that the physicians did "furnish" the laboratory services.

The physicians received the kickbacks "in connection with" the laboratory services. The statute is satisfied if there is a logical relationship between the kickbacks and the services for which federal funds were paid. In our case, the kickbacks were an agreed part of the performance of the laboratory services. The relationship between the physicians and the laboratory was formed around the payment of the kickbacks. The physicians chose to refer patients to a specific laboratory because of the negotiated

---

1. According to my construction of § 1396h(b)(1), the amended informations do state an offense. In his zeal to uphold the guilty pleas, the Assistant United States Attorney argued seriously that this Court should consider the amended informations to have been informally amended by oral argument and by his response to the defendants' motion to dismiss the informations. Further, he contend-

ed that the district court had *implicitly* granted leave for this informal second amendment. The Government's position is not supported in the record and is an attempt to play "fast and loose" with the established rules of criminal procedure and principles of due process. Such overly zealous advocacy should be tempered. In other respects, the Assistant United States Attorney prepared a fine brief.

kickback payments. The phrase "in connection with" has a sufficiently broad meaning in common parlance to conclude that the kickbacks were received "in connection with" the laboratory services.

The legislative history bolsters my interpretation of § 1396h(b)(1) as enacted in 1972. Congress intended to prohibit in the administration of the Medicaid program any practices which were unethical or were proscribed by state law. H.R.Rep.No.92–231, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 4989, 5007, 5093, 5308. The physicians' receipt of kickbacks for patient referrals to the laboratory is forbidden by both Section 21 of the Code of Ethics of the Michigan Association of Osteopathic Physicians and Surgeons and by state statute, Mich.Comp.Laws Ann. § 445.162. Similarly, a laboratory is prohibited from soliciting business by paying kickbacks. Mich.Comp.Laws Ann. § 333.-20525(c) (1978). Since the language of the statute permits, § 1396h(b)(1) should be interpreted to effectuate congressional intent. *Barrett v. United States*, 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976); *United States v. Tarter*, 522 F.2d 520 (6th Cir. 1975). The ordinary meaning of the statutory language and the 1972 legislative history compel the conclusion that the physicians' receipt of kickbacks under the circumstances in this case is a violation of § 1396h(b)(1).

Finally, because the ordinary meaning of the plain language of § 1396h(b)(1) would have notified the defendants that their conduct was unlawful, the statute is not unconstitutionally vague. *United States v. Hancock*, 604 F.2d at 1002.

Accordingly, I concur with the opinion and judgment of the majority.